## New York Commission of Appeals.

*September*, 1874.

### RICHARD BROWN, APPELLANT, *against* JOHN McKEE, RESPONDENT.

Opinion of Commissioner Dwight as to party-walls. Validity of oral agreement. When covenants for, run with the land. The question whether the covenant is personal to the builder; or enures to the benefit of his grantee, and whether it is personal to the covenantee, or may be enforced against his grantees, considered. The phrase "use" of a wall and the term "when used" explained.

The following is the dissenting opinion in Brown v. McKee (57 *N. Y.* 684), and is to be read in connection with the decision as there reported. The acknowledged ability of Professor Dwight, the masterly manner in which the questions involved are discussed, the importance of the subject, and the fact that the opinion is not reported elsewhere, are the reasons which induce its publication now. The court did not disagree with the reasoning of Commissioner Dwight, but put its decision on the ground that the action had been prematurely brought. This opinion is certainly a valuable contribution to the law of party-walls. See foot-note at end of opinion.

Appeal from a judgment of the general term of the supreme court of the first department, affirming a judgment rendered at the special term.

In the year 1854, one David McMaster was owner in fee simple of a tract of land on the southerly side of West Twenty-fifth street, in the city of New York. William A. Cummings was also owner in like manner of a lot on

the easterly side of McMaster's property, each being of the same depth, viz., ninety-eight feet and nine inches to the center of the block. McMaster entered into an oral agreement with Cummings at the time above specified, whereby he was to erect a party-wall from the street line backwards, towards the rear of the lot about fifty feet, one-half of which was to stand upon the lot of McMaster and the other half upon that of Cummings.

The judge found at the trial that the wall was built upon a verbal agreement between McMaster and Cummings, that the latter, his heirs *or assigns*, should have the right to use the same as a party-wall, and that when *he* or *they used the same*, he or they should pay McMaster, his heirs *or assigns*, one-half of the value of said wall. There was an exception by the plaintiff to this finding as unsupported by evidence, his claim being that the agreement was, that the value was to be paid at the time of and before the use.

In April, 1867, McMaster conveyed his lot to the plaintiff, with the tenements, hereditaments and appurtenances thereunto belonging. Cummings, in April, 1868, sold to John McElvane, who, in September of the same year, conveyed to the defendant. McElvane and the defendant respectively had notice of the verbal agreement to build the party-wall, etc., at the time of the respective conveyances to them.

In the month of May, 1869, the defendant commenced to build on his lot, and to cut holes in the party-wall for the purpose of inserting beams therein.

The action was brought to obtain an injunction against the defendant, to prevent him from using the wall without payment, and also to obtain a judgment that he should pay one-half of the value of the wall.

The judge found at the trial, that, after the injunction, the defendant abandoned the use of the wall, to which finding there was an exception as unsupported by evidence.

The judge found as conclusions of law, that the

plaintiff was not entitled to recover from the defendant the value of the party-wall, and that he was not entitled to an injunction restraining the defendant from the use of the wall as a party-wall. To these conclusions the plaintiff duly excepted.

There were several requests by the plaintiff to find facts in his favor which were refused under exception. The evidence, as affecting these and the findings before referred to, is sufficiently set forth in the opinion. The judgment entered for the defendant, on the decision at special term having been affirmed at the general term, the plaintiff appeals to this court.

*Charles H. Woodbury,* for appellant.

*O. E. Bright,* for respondent.

DWIGHT, Com.—The first question to be considered in the present case is as to the ownership of the wall as between McMaster and Cummings. Although the agreement that the wall should stand in part on Cummings' land, was oral, yet when McMaster acted on the faith of it, that which was at first an oral contract, void by the statute of frauds, became valid in equity, and gave McMaster a right which Cummings could not recall (Rawson *v.* Bell, 46 *Ga.* 19). The wall itself, however, belonged absolutely to McMaster. It was composed of his materials and wholly constructed by his labor. Nothing could give one-half of it to Cummings, except the doctrine of *quicquid plantatur solo, solo cedit.* That rule has no application to additions made by one to the land of another with the consent of the owner. It is applied in the case of trespassers, or of additions made by owners themselves. But when the owner of materials attaches them to the real estate of another with the latter's consent, there is neither reason or justice, nor public convenience in a rule which would deprive the owner

of the materials or his property in them. This proposition is so fully sustained by authority as to become elementary law (Aldrich v. Parsons, 6 *N. H.* 555; Osgood v. Howard, 6 *Greene*, 452; Russel v. Richard, 1 *Fairf.* [10 *Maine*] 429; Ashman v. Williams, 8 *Pick.* 402; Doty v. Gorham, 5 *Pick.* 487; Dann v. Dann, 38 *N. H.* 429, 431; Mott v. Palmer, 1 *N. Y.* 571; Ford v. Cobb, 20 *N. Y.* 344; Keyser v. School District, 35 *N. H.* 480; Norte v. Borham, 18 *Ind.* 233; 1 *Washb. on Real Prop.* ch. 1, §§ 4, 4a). If Cummings or his grantees did not use the wall, McMaster and his assigns would, according to these rules, have a paramount right to have one-half of their wall stand on the land of Cummings, as well as of any of his grantees acquiring their interests with notice of the rights of the owner of the wall. The next inquiry is, as to the rights which would have been acquired by Cummings had he used the party-wall. He was under no obligation to do more than permit the wall to stand according to his license. He, however, had a conditional right or privilege, if he saw fit to exercise it, to become the owner of the party-wall by using it. This is to be fairly inferred from the agreement that he was to pay one-half of its value. Had the agreement been written, this would have been clear. Having an election under the arrangement, either to let the wall stand on his land and pay nothing, or to use it and pay half its value, when he elected the latter his rights would have become fixed and the election irrevocable (Firemen's Insurance Co. v. Lawrence, 11 *Johns.* 261; S. C., 14 *Johns.* 353; *Com. Dig.* 614). Cases in equity are to be found in *Anstruther*, 229; Dick v. Barrell, 2 *Strange*, 1248. The fact that the agreement was oral does not alter the case. The part execution of it takes the case out of the statute of frauds. By the oral agreement, on paying half the value, Cummings was to become the owner of a true party-wall. He was to own not only the one-half standing on his own land, but to have an easement in the portion standing on McMaster's

land. This is the only rational construction of the con-
tract consistent with justice and a due regard to the
rights of Cummings. If the oral agreement is not to be
carried out, the result would be that McMaster obtains
a valid easement as against Cummings, but Cummings
would lose the use of his land and have no corresponding
right as against McMaster. The next inquiry is whether
the agreement between the original parties is binding on
their respective assignees. This may be considered as
well as to the doctrine of covenants running with the
land as to the rule governing courts of equity independent
of that doctrine. I think that the agreement between
the parties in the present case resulted in a state of facts
which was equivalent to a case of "covenants running
with the land." The parol agreement between the parties
contemplated a written agreement. One was drawn and
never executed, which was shown by the uncontradicted
evidence of McMaster to represent the understanding
between the parties. This proposed agreement contained
a clause that the covenants in the agreement should be
deemed to be "covenants running with the land" and bind-
ing not only on the immediate parties but on their assigns
while owners of the land. If an agreement of an execu-
tory nature had been entered into in writing that the
parties should make an executed agreement for covenants
running with the land, it would have, according to estab-
lished principles, given each of them a right to such cove-
nants enforceable in equity. There would have, of course,
been no covenants on which an action could be brought
in a court of law, but equity would have upheld and main-
tained them. The parol agreement, when carried into
execution, is, in spite of the statute of frauds, precisely
equivalent in equity to the written agreement. Hence, if
McMaster had proceeded against Cummings he must have
brought his action in this [supreme] court, for he would
have had an equitable and not a legal interest in the
covenants running with the land. He would, however,

have had the same recognition in this court as in a court of law, under the settled maxim that " equity follows the law." The question is then fairly presented whether, if the proposed agreement between these parties had been actually signed, there would have been a case of covenants running with the land.

The great criterion for determining whether a covenant runs with the land or not, is the intention of the parties, provided that the covenant is of such a nature that it can, under any circumstances, bind the land in respect to assignees. Of course, if the covenant is of such a character that it is essentially personal, the provision that it shall run with the land is nugatory (Masury *v.* Southworth, 9 *Ohio St.* 340, 347). It is then necessary to consider whether the covenant in the present case is of such a nature that it can run with the land. It is to be noticed that there is an actual estate in the land in favor of Mc-Master growing out of the executed parol agreement. True, it is an incorporeal hereditament, an easement, but still an estate. The case, accordingly, bears no resemblance to Harsha *v.* Reid, 45 *N. Y.* 415, where there was a covenant with a third person, having no interest or estate in the land, not to put a grist-mill on certain premises. It was a mere covenant in gross, having no connection with any estate; and it was properly held that it did not run with the land, there being no land with which the benefit of the covenant could run. On the other hand, it granted no interest in the premises and created no charge thereon. The case of Cole *v.* Hughes (54 *N. Y.* 444) has not been overlooked. The learned judge who delivered the opinion in that case states that he finds no case in conflict with the view that the right to compensation in such cases is personal to the first builder, and is a mere chose in action which does not pass to the grantee of the land. Reference may, however, be made to the following authorities, among others: Savage *v.* Mason, 5 *Cush.* 500; Weyman *v.* Ringold, 1 *Bradf.* 40; Brown *v.* Penz, 1 *Ct. of*

*App. Dec.* 227; Keteltas *v.* Penfold, 4 *E. D. Smith*, 122. Savage *v.* Mason is a very distinct authority. There was a partition of a large number of lots with covenants that the center of party-walls might be placed on the lines dividing lots from contiguous lots, and that the owner of a contiguous lot whenever he should make use of any such wall in any building, should pay for one-half of the wall by him so used. There was a plainly expressed intention in the partition deed, that the covenant should run with the land. The court said, there was a privity of estate between the contracting parties in the land to which the covenant was annexed. The covenant is in terms between the parties and their respective heirs and assigns; it has direct and immediate reference to the land; it relates to the mode of occupying and enjoying the land; it is beneficial to the owner as owner, and to no other person; it is, in truth, inherent to and attached to the land and necessarily goes with the land into the hands of the heir or assignee. In Weyman *v.* Ringold, the subject was discussed at length and in a learned and comprehensive manner by the late Surrogate BRADFORD. It was held that a covenant to pay W., his executors, administrators and assigns, one-half the value of a party-wall about to be built by W., when used by the covenantor, there being an express agreement that the covenant shall bind the land and the owners thereof for the time being, enures to the benefit of the grantee of the land of the covenantee, and the executors of the covenantee have no interest therein. It will be observed that this case only decided that the *benefit* of the covenant would enure to an assignee of the owner of the covenant. It was not necessary to decide that the *burden* would attach to the land while owned by the assignee of the covenantor, though the surrogate expresses a strong opinion upon that point that it would where there is an estate in the land. The cases are extensively collected on p. 34 of the report.

In Keteltas *v.* Penfold, 1 *E. D. Smith*, 122, the point

was decided that the burden of the covenant would run with the land as against the assignee · of the covenantor. In that case, there was an agreement by A., giving a right to construct a party-wall, one-half thereof upon his lot, and covenanting for himself, his heirs and assigns, whenever he should erect a new building, to pay B.; his heirs and assigns, a moiety of the value of such portion of the wall as he should use. This was held to be a grant of an easement or incorporeal hereditament, and that the covenant connected with it binds and is a charge upon the land. It was decided accordingly, that the devisees of the land were liable as assignees to the burden of the covenant made by their devisor. The same ground is ruled in Wickerham *v.* Orr, 9 *Iowa,* 254.

There has been much controversy, with a tendency to confusion, growing out of an attempted distinction between the benefit of a covenant and the burden of it as affecting assignees. The truth is that there is no valid distinction between them. Both will pass to an assignee as incident to an estate; neither will pass without it. This point met with exhaustive discussion in the great cases connected with the Van Rensselaer estate (Van Rensselaer *v.* Hays, 19 *N. Y.* 68; Same *v.* Read, 26 *Id.* 558; Same *v.* Slingerland, *Id.* 480; Same *v.* Dennison, 35 *Id.* 393; Same *v.* Barrington, 39 *Id.* 9). Van Rensselaer *v.* Hays expressly decided that the burden of a covenant to pay rent passed with the land as an incident to it, though there was no reversion in the grantee (pp. 87, 99).

The court was in doubt whether the benefit of the rent would pass to an assignee in such a sense that he could recover upon it in an action of covenant at law, and independent of the statute (Laws of 1805, c. 98). In Van Rensselaer *v.* Read, *supra*, the court resolved the doubt that attended the case of Van Rensselaer *v.* Hays, holding that the legal right of action on a covenant for payment passes to the assignee of the rent at common law, and independently of the act of 1805. It was decided that the

action was maintainable on the privity of estate between the grantee of the rent and the grantee of the land out of which the rent issues, though there is no reversion in the grantor. These authorities establish that the burden of a covenant will run with a corporeal estate in the land, and the benefit of it with an incorporeal one. They do not specifically decide the point that the burden of the covenant will pass with an incorporeal hereditament. They do, however, affirm this in principle. In 26 *N. Y.* 576, it is said, "All the reasons for holding covenants assignable apply with equal force to covenants relating to incorporeal hereditaments ;" and again, on p. 577, "it is a settled proposition that covenants may run with incorporeal as well as with corporeal hereditaments " (Bally *v.* Wells, 3 *Wilson*, 26 ; Mayor of Congleton *v.* Pattison, 10 *East*, 130 ; Keteltas *v.* Penfold, *supra; Platt on Covenants*, 469).

The attempted distinction between the assignability of a covenant, as it respects the benefit and the burden of it, is disapproved by Mr. *Washburn* in his work on Real Property (vol. 2, p. 262, 3 ed.). After referring to the doctrine, he says : "The point has never been determined in this way by a full court, though assumed by individual judges, and, respectable as the opinions in its favor may be, the doctrine contended for is opposed to well-settled principles, as well as the highest authority." He then proceeds to say that the whole subject of assignability depends on privity of estate, and that this has been the rule from the time of Webb *v.* Russell (13 *Penn.* 393) to the present day. It has been sufficiently shown in the earlier part of this opinion that, in the present instance, an estate of an incorporeal nature existed between the parties. The builder of the wall gained an easement on the land of his neighbor ; the latter, on electing to pay for the use of the wall, had an easement on the land of the builder. These were permanent interests, and of such a nature that the benefit and burden of covenants might

run with them.   The case thus bears no resemblance to
Hart *v.* Curtis (19 *Pick.* 459), where the owners of ad-
joining estates entered into mutual covenants as to the
the wheels that they would use in their respective mills.
It was rightly held that these did not bind assignees, as
there was no privity of estate of any kind whatever.
Weld *v.* Nichols (17 *Pick.* 538) is meagerly reported, and
probably turned on some express covenant controlling the
rights of the parties.   If it maintains any such doctrine
as that a covenant to pay for a party-wall will not run
with the land in the absence of special provisions to the
contrary, it is in opposition to a later and carefully con-
sidered case already referred to, in the same court (Savage
*v.* Mason, *supra*), and must be deemed to be overruled.
Block *v.* Isham (16 *Am. Law Reg.* 8) depended wholly on
Weld *v.* Nichols, and must share its fate.

The cases in Pennsylvania, properly considered, do
not conflict with the view that covenants of this nature
run with the land (Todd *v.* Stokes, 10 *Penn. St.* 155 ; Gil-
bert *v.* Drew, *Id.* 219 ; Davids *v.* Harris, 9 *Id.* 503 ; Inglis *v.*
Bringhurst, 1 *Dallas*, 341).   In Todd *v.* Stokes the ques-
tion was whether the right to collect the money stipu-
lated to be paid for the use of the party-wall was assign-
able with the land, or whether it belonged to the first
builder.   The decision turned upon the language of a
statute which will be hereafter considered.   The same
remark may be made of Gilbert *v.* Drew and Davids *v.*
Holmes.   The statute referred to was passed February
24, 1721, and was made applicable to the city of Phila-
delphia.   It provided that the "first builder of a party
wall shall be reimbursed for one moiety of the charge of
it, or for so much as the next builder shall use, before he
breaks into the wall."   In construing this statute, the
sole inquiry was not as to any agreement between the
parties, as in the present case, but simply as to the legal
force of the statutory expressions.

In other words, what did the phrase "first builder"

mean? Plainly, it could mean nothing but the person who erected the wall. However inequitable the construction might be, the court was tied down by the phraseology of the statute. The legislature, on the other hand, by its *fiat*, made the burden of the covenant follow the land, since it provided that the "second builder" should pay, no matter how remote a purchaser of the adjoining lot he might be. The awkward result of an ill-considered statute has been wholly done away with by a recent act, April 10, 1849, that provides that, "in all conveyances of houses and buildings, the right to, and compensation for, the party-wall built therewith, shall be taken to have passed to the purchaser, unless otherwise expressed, and the owner of the house for the time being shall have all the remedies in respect to such party-wall as he might have in relation to the house to which this attached."

In commenting on this statute, the Pennsylvania court said, in Knight *v.* Ranken, 30 *Penn. St.* 574, that "*this made the interest to be in law, what it always was in fact, an interest in the realty, and not a mere personal right.*" There can be no stronger possible evidence that the court in the earlier cases felt itself bound by a harsh statutory rule, the effect of which it could not avoid, as in a case governed by a like principle in this court (Rosenplarnter *v.* Roessle, 54 *N. Y.* 262). It is, accordingly, my view, in the present case, that the covenant to pay for a party-wall when used, may run with the land, and bind assignees of the covenantor. There will be no controversy on the point that the assignee of McMaster will take the easement appertaining to him, and with it the benefit of the covenant. The easement would pass under the word "appurtenances" in his deed (3 *Washb. on Real Prop.* 340, §§ 25, 32, 3 ed.; Gayetty *v.* Bethune, 14 *Mass.* 49; McDonald *v.* Laidall, 3 *Rawle*, 492; Jackson *v.* Hathaway, 15 *Johns.* 427).

There is still another aspect from which this question may be regarded. This concerns the rights and obliga-

tions of the parties in a court of equity. In that court, the great point in determining whether the assignee is liable is, whether he had notice of the agreement between the original parties. It is immaterial whether there be a technical covenant running with the land or not. This point was not at all involved in the case of Cole v. Hughes, and is still open to full consideration.

Lord Brougham, in the case of Keppell v. Bailey (2 *Mylne & K.* 517), gave utterance to a *dictum* upon this subject which has led to much confusion. He said: "The knowledge by an assignee of an estate that his assignor had assumed to bind others than the law authorized him to affect by his contracts, and had attempted to create a real burden upon property which is inconsistent with the matter of that property and unknown to the principles of the law, cannot bind such assignee by affecting his conscience."

This has been interpreted by some to mean that, unless the covenant is of such a nature as to "run with the land," in the view of a court of law, knowledge of its existence will not, in a court of equity, bind an assignee. This conclusion was emphatically repudiated in Tulk v. Moxbury (2 *Phillips*, 775–779). The lord chancellor accordingly said, "With respect to the observations of Lord Brougham in Keppell v. Bailey, he never could have meant to lay down that this court would not enforce an equity attached to land by the owner, unless under such circumstances as would maintain an action at law. If that be the result of his observations, I can only say that I cannot coincide with it." The proposition which was established in the case was that a covenant between a vendor and purchaser, on the sale of land, that the purchaser and his assigns shall use or abstain from using the land in a particular way will be enforced in equity against all subsequent purchasers with notice, independently of the question whether it be one which runs with the land so as to be binding upon subsequent purchasers

Brown v. McKee.

at law. Tulk v. Moxbury has been confirmed repeatedly
in this respect, and has become settled law, Lord BROUGH-
AM's dictum as interpreted in that case having been
uniformly received with marked disfavor in the English
courts (De Mathas v. Gibson, 4 *De Gex & Jones*, 276;
Wilson v. Hart, *Law Rep.* 1 *Chan.* 363; Colt v. Pawle,
4 *Id.* 654; Whatman v. Gibson, 9 *Sim.* 196; Cole v.
Lewis, 5 *De G. M. & G.* 1; Western v. McDermot, *L. R.*
2 *Ch. App.* 12; Parker v. Nightingale, 6 *Allen*, 341).
The spirit of the rule is well explained by Lord Justice
KNIGHT BRUCE in De Mathas v. Gibson, *supra*. He
says: "Reason and justice seem to prescribe that, at least
as a general rule, where a man by gift or purchase
acquires property from another with knowledge of a pre-
vious contract, lawfully and for a valuable consideration
made by him with a third person, to use and employ the
property for a particular purpose and in a specified man-
ner, the acquirer should not, to the material damage of
the third person, in opposition to the contract and incon-
sistently with it, use and employ the property in a man-
ner not allowable to the giver or seller, from whom he
derives his own title" (p. 282). In Parker v. Nightingale,
the whole subject is carefully considered by BIGELOW, Ch.
J., and the distinction between the rule in law and in
equity clearly pointed out. It is there said: "A court of
chancery will recognize and enforce agreements concern-
ing the occupation and mode of use of real estate,
although they are not expressed with technical accuracy,
as exceptions or restrictions out of a grant, nor binding as
covenants real running with the land. Nor is it at all
material that such stipulations should be binding in law,
or that any privity of estate should subsist between
parties in order to render them obligatory, and to war-
rant equitable relief in case of their infraction. . . ."
So long as an owner retains a title in himself, his cove-
nants and agreements respecting the use and enjoyment of
his estate will be binding upon him personally, and can

Brown v. McKee.

be specifically enforced in equity. When he disposes of it by grant or otherwise, those who take under him cannot equitably refuse to fulfill stipulations concerning the premises of which they had notice. It is upon this ground that the courts of equity will afford relief to the parties aggrieved by the neglect or omission to comply with agreements respecting real estate after it has passed by *mesne* conveyances out of the hands of those who were parties to the original contract. A purchaser of land, with notice of a right or interest in it existing only by agreement with his vendor, is bound to do that which his grantor had agreed to perform, because it would be unconscientious and inequitable for him to violate or disregard the valid agreements of the vendor in regard to the estate of which he had notice when he became the purchaser (Burrows *v.* Richards, 8 *Paige*, 351. See, also, Whitney *v.* Union Railway Co., 11 *Gray*, 364). In applying the principles to the case at bar, it will be found that the defendant, having had full notice of the arrangement between McMaster and Cummings, is bound in conscience not to avail himself of the privilege of the agreement without bearing the burdens. His claim, in substance, is that he can rest his beams on another man's wall and pay nothing for it to any one, for if the burden of the covenant does not, either in law or in equity, follow the land, he liable to no one. The same general course of reasoning shows that the benefit of the covenant in equity no longer appertains to McMaster, but enures to the plaintiff. When McMaster conveyed, the *entire* wall passed to his grantee, together with the easement. When the defendant makes use of the wall, he takes not McMaster's property (which has already passed from him), but the plaintiff's. He cannot avail himself of the agreement to take the wall without being equitably bound to pay him who is the owner at the time he appropriates it. This point was decided in this court in Brown *v.* Penz, 1 *Ct. App. Dec.*

227. That was an action in equity in which it was held that the equitable benefits and obligations of a party-wall agreement, such as is now in question, attached to the assignees of the respective parties. It is said by the reporter to have been disposed of by an equally divided court. Our brother, Judge HIRAM GRAY, who was a member of the court when the decision was rendered, dissented from the prevailing view, and remembers that it was a decision by a majority. It is binding as an authority and is founded on good sense and convenience. It is a matter of common knowledge in the city of New York that such agreements are much resorted to by professed builders and others, and great practical injustice would be done if the party who has incurred a large expenditure to build an entire wall should be deprived of all remedy against an assignee of a contiguous proprietor with whom a well understood contract was made. It is believed that a decision that the assignees of the original contracting parties are not within the scope of the contract, either in law or equity, would be an unwelcome surprise to the profession. Assuming it now to be established that the covenant in the case at bar binds the assignee, the next inquiry is as to its true scope and meaning. The judge at the trial found that the agreement was that Cummings, or his assignees, should have the right to use the wall as a party-wall, and that, when he or they used the same, he or they should pay McMaster, his heirs or assigns, one-half of the value of said wall. The terms of the unexecuted written agreement were, " if the party of the second part, etc., shall at any time use the said wall, he or they shall then pay to the party of the first part the value of one-half of such part as shall be used. McMaster testified that the oral agreement was that Cummings, etc., was to pay before he used the wall, not after he had elected to use it; that his experience as a builder had always been to that effect, and that Cummings was not to put a chisel into the wall until

he had paid for it. He further testified that the proposed written agreement was drawn to carry out that understanding, by one of his clerks. Cummings was not sworn. The plaintiff insists that the finding of the judge was unsustained by evidence, and was, therefore, erroneous in point of law.

If the unexecuted written instrument be assumed to be the true expression of the intent of the parties, its fair construction is, that payment was to be made as soon as the election to use the wall became fixed and irrevocable, as shown by the defendant's outward acts of taking possession. It is unnecessary to indulge in nice and subtle criticism of the word " use," as employed by the parties. A reasonable and ordinary meaning must be attached to it. Johnson, in his *Dictionary*, defines the word " use " as " to employ for any purpose." Such use may be temporary or permanent. I may " use " my neighbor's carriage for a single day. So one may have to " use " his wits in a single instance, or to " use " his right rather than his left hand in throwing a stone, or " use " a trumpet in calling together an assembly. It is plain in all these instances that it means to employ for a purpose, and nothing more; so, when the defendant put his beams upon this wall, he employed it for a purpose, he used it (Brown *v.* Penz, 11 *N. Y. Leg. Obs.* 29). Any other construction would lead to most unsatisfactory conclusions. If it means anything more than this, the defendant might put up one building and take down another, and so on successively, without paying anything for the employment of the wall for his purpose. I do not see how he would pay anything until the whole capacity of the wall to render support had been exhausted. This would make the word " use " equivalent to " use up " or destroy. From the best reflection that I can give to the subject, I think that the defendant's use of the wall by inserting beams in it and the payment of half its value were concurrent acts.

While he had a clear right to use the wall, that right was conditional upon payment.

It is now necessary to inquire whether the defendant, having wholly refused to pay, and being at the same time engaged in constructing a building on his lot and also using the plaintiff's wall, could be restrained by injunction. It has already been shown. that the wall, until Cummings or his assigns elected to make use of it under the agreement, was wholly the property of Mc-Master. The entire interest passed by his assignment to the plaintiff. It would be an unreasonable and a violent interpretation to hold that McMaster intended to retain the one-half of the wall standing on Cummings' land, as it could be of no possible use to him. It must stand there permanently to give the plaintiff the benefit of the easement which he had on the land formerly belonging to Cummings and now owned by the defendant. The property in the wall accordingly passed to the plaintiff as an incident to his grant, and as appurtenant to his estate, having thus the complete ownership of the wall vested in him. The defendant could only make use of it by payment according to the agreement. Prompt payment might be waived by the plaintiff. On the other hand, it might be insisted upon. In that case, the defendant might perhaps be treated as a trespasser or wrongdoer. So, it would seem that the plaintiff might take this position towards the defendant. You have elected to make use of my wall, which has now become a party-wall. There is an easement in your favor on my land, as well as one in my favor on your land. I insist that you shall, on equitable grounds, contribute to pay one-half of its value, and until that is done, and, as part of the relief to which I am entitled, you should be temporarily restrained from further proceedings. You shall not avail yourself of the benefit of the contract between our grantors except by taking it *cum onere.*

This was no hardship upon the defendant. It cannot

Brown v. McKee.

be contended, with any show of reason, that he was prevented by the injunction from using the wall. The restraint was only subordinate to the general relief. He could at any time relieve himself from it by doing his duty and paying for the wall which he was using. If he was influenced by the erroneous idea that he could use another man's wall without paying for it, and that, having once used it, he could at pleasure abandon it, he must attribute any loss which he may sustain to his mistaken view of the law. He cannot be said to be prevented from the use of the wall when he himself has created the obstacle which stands in the way. No stress should be laid on the fact that the wall of the plaintiff was, to some extent, made use of in the support of a temporary building standing on the defendant's lot. It is clear, from the evidence, that the use was by a mere tenant without the sanction of the landlord and without the knowledge of the plaintiff or his grantors. If the case is to be governed by the law of covenants running with the land, the act of the tenant was no breach of it. He must be regarded as a stranger committing a wrongful act—as a mere trespasser. If it is to be disposed of under the rules of equity, it is plain that the equitable obligation of the defendant can only be discharged by making payment for the wall when he himself used it. The temporary use by the tenant, expiring with his tenancy, and without the plaintiff's knowledge, would have no tendency to relieve him from an obligation based on solid foundations of justice and equity. The judge at the circuit accordingly erred in his conclusions of law in holding that the plaintiff was not entitled to recover from the defendant the value of the party-wall. There should be a new trial granted, with costs to abide the event.

### Explanatory Letter from the Plaintiff's Counsel.

New York, January 18, 1888.

Hon. David McAdam.

*Dear Sir :* I did not notice 'till this morning that you requested the opinions in Brown v. McKee. I never had any other than Dwight's

opinion. I have always understood, however, that the decision was placed upon the ground that the action was prematurely begun ; that the agreement between the original parties was that the obligation to pay did not arise until the adjoining owner *used* the wall, and as I began the action after he had made holes for two tiers of beams and inserted the beams for but one tier, and obtained an injunction restraining him from any further use until he paid for so much of the wall as he intended to use, I had prevented him from using the wall, and so was not entitled to maintain the action. I should have waited until he had *used* the wall and brought an action for the value of the wall. This is, as I understand, the prevailing opinion of the court.

I am, yours truly,

CHARLES H. WOODBURY.

### Editor's Note.

In Scott v. McMillan (76 *N. Y.* 144), Judge DANFORTH said: "In the case of Brown v. McKee, the plaintiff's rights were not considered, the court holding that whatever they might be, no cause of action had accrued "

In Bedell v. Kennedy (38 *Hun,* 510), the grantee of the covenantor was held to be liable for the value of the one-half of the party wall.

In Hart v. Lyon (90 *N. Y.* 663), following Cole v. Hughes (54 *N. Y.* 444), Scott v. McMillan (76 *N. Y.* 141), the court hold the right and liability to be personal.

See, also, Squier v. Townsend (2 *City Ct. R.* 142). The more one reads and considers the opinion of Prof. DWIGHT in the Brown v. McKee case, the more he becomes impressed with its logical force.